**F. Gordon Allen,** OSB No. 770103
E-mail: gordona@mcewengisvold.com
McEwen Gisvold LLP
1100 SW 6th Avenue, Suite 1600
Portland, OR 97204
Tel. 503-226-7321
Fax 503- 243-2687
**Attorney for Plaintiff Randy Scheets**

## UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

| | | |
|---|---|---|
| **RANDALL SCHEETS,** aka **RANDY SCHEETS,** | ) ) ) | Case No. **CV'07 - 1147 - AS** |
| Plaintiff, | ) ) ) | **COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING BREACH OF FIDUCIARY DUTIES BY CPA FIRM** |
| v. | ) ) | |
| **WILLIAM HOLMES, CPA,** and **RUSS ROYER, CPA,** individually, and **HOLMES ROYER, LLP,** | ) ) ) ) | **(Jury Requested)** |
| Defendants. | ) ) ) | |

---

### I.   JURISDICTION

1.   Randall Scheets (Scheets) resides in Lacey, Thurston County, Washington.

2.   William Holmes, CPA (Holmes) resides in Portland, Oregon.

3.   Russ Royer, CPA (Royer) resides in Portland, Oregon.

4.   Holmes Royer, LLP (HR) is an Oregon limited liability partnership doing business as an accounting firm in Portland, Oregon.

5.   Diversity jurisdiction exists under 28 U.S.C. 1332 and, insofar as there is any lack of diversity, under the Court's supplemental jurisdiction under 28 U.S.C. 1367.

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREACH OF FIDUCIARY DUTIES BY CPA FIRM --  **- 1**

6.      Venue is proper as the actions and omissions alleged herein as to Holmes and HR occurred primarily in Portland, Oregon where Holmes resides and HR does business.

## II.      **PARTIES**

7.      Plaintiff Randall Scheets is an outside minority shareholder of Encompass Teleservices, Inc. (ETI)

8.      Holmes and Royer are each certified public accountants who are licensed to practice accounting in Oregon.  ETI was a client of Holmes from 2002-2005.

9.      HR is a limited liability partnership.  Holmes and Royer are its partners. Each practices accounting and supervises the practice of accounting by other professionals and staffs its employees.  HR provides accounting, taxation, bookkeeping, consulting, and litigation support services to its clients. Litigation support work includes forensic auditing and accounting relating to claims against accountants, and criminal defendants, including white collar crime defense work and damages.

## III.      **NON PARTIES**

10.      ETI is an Oregon corporation, formerly doing business in Beaverton as a call center. It is now a debtor in a case under Chapter 7 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Oregon.  It ceased business operations on or about May 8, 2007.  Thomas Renn is its Chapter 7 Trustee.

11.      Savant is an Arizona corporation formerly doing business in Beaverton, Oregon as a call center.  On or about November 2004, it became a wholly owned

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREACH OF FIDUCIARY DUTIES BY CPA FIRM  --  - **2**

subsidiary of ETI.  Savant ceased business operations on an unknown date in January or February 2007.

12.    Michael A. Boyle, a co-founder of ETI, has been a minority and majority shareholder, director, officer, employee, and independent contractor of that company.

13.    Patrick Boyle is Michael Boyle's father.  At different times, Patrick Boyle has been a director, majority shareholder, officer, and creditor of ETI.

14.    Karol W. Kersh has served as ETI's general counsel.

15.    John J. Cargal was, at different times, a director, officer, and shareholder of ETI, and an officer of Savant.

16.    At all times relevant to the claims pled herein, ETI, Savant, Patrick Boyle, Michael Boyle, John Cargal, and entities controlled by each of them were clients of Holmes and HR.

### IV.    ETI'S BUSINESS PLAN AND SCHEETS' EXPECTATIONS

17.    ETI was formed to take advantage of certain technological advancements in the business call-center service industry.  ETI offered out-sourced customer contact management to a broad range of businesses, including companies engaged in the financial services, telecommunications and energy industries.

18.    Randy Scheets was induced to become a founding investor in ETI based upon representations that ETI could successfully capitalize upon new technical advances in call-center technology and that ETI would ultimately be sold as an ongoing business in order to achieve a return on investment for its shareholders.  Michael Boyle and John Cargal represented to Mr. Scheets that if the business plans were successful

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREACH OF FIDUCIARY DUTIES BY CPA FIRM  --  **3**

that ETI would be sold and that the shareholders would obtain a substantial return on their investment in several years time.  It was further represented to Mr. Scheets that ETI would be operated as an S Corporation, and that profits would be distributed to its shareholder investors as a means for obtaining return on investment.  Based upon that represented business plan, Mr. Scheets invested in ETI. Mr. Scheets has remained a minority shareholder and has had no involvement in the day-to-day operations or control of ETI.

### V.    THE GRAVES ALLEGATIONS OF CORPORATE MISCONDUCT

19.    From the date of ETI's incorporation until July 4, 2001, Mr. David A. Graves served as a Director of ETI along with Co-Directors Michael A. Boyle and John J. Cargal.

20.    On July 4, 2001, Mr. Graves was removed from his position as a Director at a special shareholders' meeting called at the request of Co-Directors Michael A. Boyle and John J. Cargal.  Directors Boyle and Cargal declined to provide an explanation for their request to remove Mr. Graves from office.  Mr. Graves was removed without discussion upon the vote of controlling shareholders Michael Boyle, by his father Patrick Boyle, John Cargal, and by John Cargal as proxy for his parents Jack and Myoko Cargal, who together exercised control over ETI.  That corporate resolution was opposed by both Mr. Graves and by Mr. Scheets, to no avail.

21.    In April 2002, Mr. Graves executed a declaration charging that his former co-directors, Michael A. Boyle and John J. Cargal, along with Patrick Boyle, had engaged in a willful pattern of misconduct involving self-dealing, preferential

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING BREAK OF FIDUCIARY DUTIES BY CPA FIRM -- - **4**

distributions, and overt acts of fraud. Based upon such alleged misconduct, Mr. Graves charged that his co-directors and the controlling shareholders were no longer pursuing ETI's business plan but were instead using ETI as a tool for their own self-interest.

22.    Based upon the Graves declaration, Mr. Scheets demanded that he be permitted to inspect and copy ETI's corporate records, including its general accounting ledger and tax records. Mr. Scheets' request was denied. ETI represented to Mr. Scheets during an annual shareholders meeting that ETI had experienced substantial losses and on that basis represented that ETI had a negative net worth. To appease Mr. Scheets' concerns, ETI represented that it would conduct an independent financial investigation regarding the Graves allegations regarding corporate wrongdoing.

23.    In June, 2002, former director Graves filed suit against ETI, alleging that the corporation's directors had engaged in self-dealing and had misdirected corporate assets to their own private use. ETI and director/officers John Cargal, Michael Boyle and Patrick Boyle, each denied the Graves' allegations and each claimed that it was instead former director Graves who had been guilty of corporate misconduct.

24.    In early 2004, ETI gave notice to Mr. Scheets that it had settled Graves' lawsuit and that it intended to purchase Mr. Graves' minority interest in the corporation for $300,000. ETI further gave notice that in order to fund the $300,000 settlement to Graves that it would seek authorization to issue an additional 300,000 shares of common stock and thereby dilute Mr. Scheets' interest in ETI. ETI further gave notice that it intended to convert from S Corporation status to C Corporation status, and would abandon its prior business objective of distributing profits to shareholders.

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREACH OF FIDUCIARY DUTIES BY CPA FIRM -- **- 5**

## VI.    ALLEGATIONS PERTAINING TO MR. SCHEETS' DISCOVERY OF CORPORATE FRAUD, SELF-DEALING, AND MINORITY SHAREHOLDER OPPRESSION

25.    To investigate these matters, and to determine the value of his interests in ETI, Mr. Scheets renewed his request for review of the corporation's records.  In response, senior ETI management denied that they were guilty of wrongdoing and attempted to persuade Mr. Scheets that the proposed $300,000 Graves settlement was justified.

26.    By letter dated May 3, 2004, which was copied to Holmes and Cargal, ETI employee and general counsel.  Karol W. Kersh, made the following fraudulent misrepresentations to Mitchell Broz, one of Mr. Scheets' attorneys:

A.    That "ETI has suffered from a chronic cash shortage from the date of its inception to the present time."

B.    That "to the best of [Kersh's] knowledge neither Mr. Patrick Boyle, Mr. Michael Boyle, nor Mr. John Cargal hold an interest in any competing business."

27.    In 2001, for the purpose of computing Mr. Scheets' share of ordinary income for his K-1, the company reported $45,733 as ordinary income.  In 2002, for the same purpose, the company reported approximately $416,588 as ordinary income.  In 2003, for the same purpose, the company reported approximately $1,042,574 as ordinary income.  In 2004, for the same purpose, the company reported $1,627,582 as ordinary income.  Therefore, Kersh's representation was false, and known by him to be false.

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING BREACH OF FIDUCIARY DUTIES BY CPA FIRM -- - **6**

28.     On or about May 28, 2004, Mr. Scheets learned of various ETI employee grievances concerning ETI, which were posted on a website devoted to such grievances.   Among other things, the ETI employees accused management of coming to work in extravagantly luxurious automobiles, namely "Ferraris and Bentleys," of purchasing a "Segway" personal transportation device for their amusement, and expending extravagant amounts of money for personal use.

29.     The ETI employee grievances were inconsistent with the prior representations made by ETI's management regarding the alleged chronic cash flow problems of the corporation.  In response, Mr. Scheets requested that the aggrieved employees of ETI contact him if they possessed proof of such misconduct.

30.     In response, Mr. Scheets received confirmation that the representations made by Mr. Kersh and ETI in the letter dated May 3, 2004 were false. Among other things, Mr. Scheets learned that Patrick Boyle, Michael Boyle, and John Cargal had diverted ETI's assets and employees into a new company which they called "Savant." ETI's employees were directed to work through a temporary agency called "Employment Trends" and through that entity then worked for Savant at ETI headquarters until construction of a new building for Savant operations was completed nearby. ETI's training and facilities were used for Savant operations and the ETI's IT department was used to construct servers and to install internet wiring and computer systems in the new Savant operations.   Savant team leaders reported to ETI's management and employees, and were instructed that the relationship between ETI

and Savant was to be kept secret.  By this scheme, existing ETI manpower, assets, and customers were secretly diverted to Savant.

31.    Further investigation revealed that Savant was secretly created as an Arizona corporation by Adam Clark at the request of John Cargal with the knowledge of Michael Boyle, and that the creation of Savant was also known and assisted by Holmes and Karol Kersch.  Further investigation also confirmed that Savant had been used as a tool to divert substantial assets to ETI management, including luxury automobiles, notwithstanding the prior claims by Mr. Kersh and ETI that the corporation suffered a chronic cash shortage.

32.    On June 17, 2004, ETI sued Scheets alleging intentional interference with economic relations; breach of shareholder's fiduciary duty/duty of loyalty; and injunctive relief.  On August 3, 2004, Scheets answered the complaint, denied ETI's allegations and asserted a counterclaim for an accounting; breach of fiduciary duty; aiding and assisting and/or conspiracy to violate minority shareholder rights; and relief under ORS 60.952.  Scheets also named counterclaim defendants Savant, ETI's controlling shareholders and officers, John Cargal, Michael Boyle and Patrick Boyle as parties to this action.  This case is pending before U.S. Magistrate Judge Dennis Hubel in Case No. 04-CU-821 HU.

33.    Karol Kersh filed a defamation action against Scheets in Oregon State Court.  The action was removed to Federal Court and Scheets answered the complaint, denied Kersh's claims and counterclaimed for the same conduct alleged within the

lawsuit against ETI and its officers.  That case is also pending before Judge Hubel in Case No. 04-CV-988-HU.

34.    ETI moved to dismiss Scheets' claims under Fed. Rule Civ. Pro. 12(b)(6), and Scheets was directed to re-plead a portion of his claim.  He did so and ETI and the individual counterclaim defendants answered in January 2005.  In the meantime, ETI had exercised a statutory right under ORS 60.952 to acquire Scheets' shares at fair value to be established by agreement or by the Court.

35.    In September 2004, Scheets propounded request for production to ETI, and in November 2004, he traveled to Portland to inspect the documents produced. The following documents responsive to Scheets' requests were conspicuously absent, although such records are ordinarily available in electronic form and can be copied to disk or CD.  ETI's and Savant's QuickBooks accounting records and their general ledger and all email or correspondence were subject to his requests for production.

36.    On November 19, 2004, Stuart Teicher, attorney for ETI, Savant, Patrick Boyle, Michael Boyle, John Cargal, and Karol Kersh, (Teicher) filed an affidavit with the Court stating that Holmes and HR had been "engaged to prepare the financial information that is a necessary predicate for [ETI's] appraiser."  Teicher also stated that:

> On October 20, 2004, [he] was advised of new information
> that had come to the attention of Mr. Holmes in the course of
> his work on this project.  Mr. Holmes had become aware of a
> potential and previously unknown financial relationship
> between Encompass and [Savant] . . . Holmes had
> discovered numerous complex, confusing and unusual
> transactions between the two entities that had to be
> examined, unraveled and understood . . .By early November
> [he] was advised that Mr. Holmes had reached the
> conclusion that the financial statements of Encompass and

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREACH OF FIDUCIARY DUTIES BY CPA FIRM  --  - **9**

Savant would almost certainly required to be consolidated in order to accurately reflect Encompass' financial condition.

37.    HR was engaged without prior approval or consent of Scheets' counsel. Following HR's completion of its engagements, Scheets first learned that Holmes and HR, however, were simultaneously providing accounting services to ETI, Savant, Patrick Boyle, Michael Boyle, and until shortly before that date, to John Cargal and a number of entities controlled by the Boyles and by John Cargal.  Teicher made no mention of ETI's acquisition of Savant's stock on or about November 1, 2004, and ETI's de jure control that accompanied Mike Boyle's, John Cargal's, and Patrick Boyle's de facto control of the company extending back to October 2003.  Nor did Teicher state that Holmes, three weeks earlier, had been providing professional assistance to ETI's officers and attorneys in connection with the acquisition of Savant's stock by a subsidiary of ETI as a consequence of Scheets' counterclaim.

38.    Holmes also failed to disclose before his engagements that he was an originator of the plan to divert ETI's contracts and business opportunities from ETI to Savant.  Holmes and HR provided "day to day" accounting services to ETI, Patrick Boyle, John Cargal, and Mike Boyle, and their assistants were in regular contact with Holmes for the purpose of maintaining the monthly books and records of account for each company.  Holmes had known of Savant since its quiet inception as an Arizona corporation in the summer of 2003, with emails connecting him to Mike Boyle and Savant in January 2004 and with John Cargal and Savant in April 2004.

39.    In November 2004, Scheets' counsel wrote to Teicher to express his concerns about his and his client's failure to produce documents relating to Savant:

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING BREACH OF FIDUCIARY DUTIES BY CPA FIRM  --  **- 10**

because Encompass has had access to a number of Savant records, including accounting records, which in turn have been made available to its accountants to perform a consolidated accounting, Mr. Scheets would need a commitment that these documents would be promptly produced. <u>In reviewing the 26 boxes of Encompass documents last month it did not go unnoticed that no records were produced regarding Savant. Mr. Scheets would therefore need a commitment that the Savant records are readily available and will be promptly produced. I trust that this will not be a problem given the outstanding requests for production; however, Mr. Scheets does request your specific advice to confirm that the parties will be proceeding in an honest and open manner concerning the Encompass/Savant documents so that the effects of the discovered misconduct can be duly evaluated.</u> We request that the documents be produced within the next two weeks and that we are told how many documents will be available for inspection and production. If a manageable number, we will make arrangements to have the documents photo-copied and shipped to our office. (emphasis added)

40.    Teicher and Holmes did not respond to this request to produce Savant's

records. Meanwhile, Holmes commenced an engagement, the scope of which was

determined solely by him. In his Affidavit, Teicher reports to the Court that he had been

advised as follows:

Savant's financial records are in disarray, incomplete, and/or not independently reliable. <u>As a result, it has been decided that Mr. Holmes must undertake extraordinary efforts, including obtaining third party verification of virtually all of Savant's financial affairs from its customers, financial institutions, and possibly its vendors.</u> Only through this method will Mr. Holmes be able to satisfy himself that, under applicable professional standards, <u>the data underlying the financial statements will be sufficiently reliable to support an appraisal of the value of the Defendant's ownership interest in Encompass.</u> (emphasis added)

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREACH OF FIDUCIARY DUTIES BY CPA FIRM  --  **- 11**

41.    Despite Scheets' attorney's request and whether in disarray or not, no original financial reports were generated by Savant before Holmes and HR took possession of those records and none have ever been produced to Scheets.  By this, Scheets includes original journal entries, reclassification entries, and adjusting journal entries made thereafter to Savant's books (as well as ETI's books) from the date of their inception.

42.    Despite Teicher's representations that Holmes would "undertake extraordinary efforts, including third party verification of Savant's financial affairs" no such extraordinary effort actually occurred.  The engagement letter between ETI and HR was signed by Patrick Boyle and dated February 1, 2005, or approximately two and one-half months after the date of Teicher's affidavit, from which Scheets then concluded that Holmes and HR were already at work.  This letter provided that HR would compile combined balance sheets as of July 31, 2004, for ETI and Savant for the seven months then ended. These Compilation Reports were substantially complete by the date the engagement letter was signed.  Holmes confirmed that

> [HR] will compile, from information [Patrick Boyle] provide[s], the combined balance sheets as of July 31, 2004, and the related combined statements of income and retained earnings of [ETI] and [Savant] for the seven months then ended. We will not audit or review such financial statements.
>
> Our engagement cannot be relied upon to disclose errors, fraud, or illegal acts that may exist. . . . In addition, we have no responsibility to identify and communicate significant deficiencies or material weaknesses in your internal control as part of this engagement.   (emphasis added)

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREACH OF FIDUCIARY DUTIES BY CPA FIRM  --  - **12**

43.    On January 14, 2005, HR issued its Savant CCA, Inc.'s reports on related party transaction ("RRPT") excluding John J. Cargal/Lagrac, Inc., 1/1/04 – 7/31/04.  This report states that it performed certain audit procedures with respect to certain transactions occurring at Savant CCA for the period between January 1, 2004, through July 31, 2004.

44.    HR's compilation reports and the RRPT were distributed to the ETI's appraiser, Scheets' appraiser, and to Scheets for his use in the valuation proceeding.  A special relationship existed between Holmes and Scheets particularly as the RRPT was based on audit procedures, and Holmes possessed knowledge of ETI and Savant's finances not known to Scheets and Holmes and HR also represented ETI, the Boyles, and Savant.

45.    ETI's appraised value was for fair market value of his shares rather than for fair value as required by ORS 60.40.460.  In June 2005, Stuart Teicher withdrew from his representation of ETI, Savant, Patrick Boyle, Michael Boyle and Karol Kersh on the basis of an undisclosed conflict of interest.  On July 7, 2005, a meeting previously scheduled between Scheets' appraiser, William Partin, CPA and ETI's appraiser and William Holmes proceeded despite the substitution of the Dunn Carney law firm into the case as attorney for ETI, Savant, Patrick Boyle, Michael Boyle, and Karol Kersh.  The meeting resulted in no progress toward settlement.  Following the meeting, Mr. Partin sent a letter to HR requesting additional documents, and Dunn Carney agreed to produce HR's working papers and files to Scheets.

46.     By letter dated August 5, 2005, and received by Scheets' counsel sometime thereafter, HR withdrew its engagement as to the Consolidated Financial Reports that it had prepared for use by the appraisers.  The letter advised that Scheets was not to rely on those Financial Reports and instructed him to return it to HR.  By letter dated August 23, 2005, and received by Scheets' counsel sometime thereafter, HR withdrew its engagement as to the RRPT.  Again the letter advised that Scheets was not to rely on these reports and instructed him to return these to HR.  ETI's appraiser then withdrew his appraisal.  More than a year had been lost due to feckless behavior by the Boyles and Holmes.

47.     Scheets knew nothing about what was then occurring and subpoenaed HR in September 2005.  In response, Scheets received documents establishing that Holmes had received two payments totaling $746,000 from an ETI account at WAMU Bank that he claimed was unknown to him.  The payments were received in connection with a loan that Patrick Boyle was making to him in that amount.  The funds were wired to Holmes on March 30, 2005 and April 7, 2005, in two installments of $373,000 from the ETI account.  Scheets learned of these transfers and the underlying transaction nearly six months after these occurred.

48.     In response to a second subpoena duces tecum directed to Holmes personally, Scheets obtained records establishing that Holmes had previously borrowed $300,000 from Michael Boyle on May 4, 2004, and repaid that amount with interest and loan fees on February 27, 2005.  Holmes borrowed $180,000 from Michael Boyle on June 29, 2004, and repaid that amount plus interest and loan fees on December 6,

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREACH OF FIDUCIARY DUTIES BY CPA FIRM  --  **- 14**

2004. Between May 4, 2004, and April 7, 2005, Holmes borrowed a total of $1,226,000 from Michael Boyle and Patrick Boyle.

49.     Despite Scheets' requests for production, and ETI's July commitment to promptly produce Holmes working papers, a subpoena duces tecum directed to Holmes and HR led to documents establishing an agreement between HR and ETI to not produce those papers to Scheets and that neither counsel disclosed to Scheets until an October 2005 discovery conference when ETI's counsel let the cat out of the bag. Thereafter, a portion of HR's working papers was produced on November 10, 2005, again excluding emails and correspondence.

50.     Scheets requested a discovery conference due to the willful withholding of ETI's WAMU account in response to his RFP's. ETI questioned the relevance of 2005 WAMU documents because "a corporate valuation . . . will occur at some point in 2004," notwithstanding the fact that the solvency of the company (and its ability to make a bona fide ORS 60.952 offer) had been called directly into question. By January 13, 2006, Scheets had discovered a second WAMU account held by ETI and demanded production of the related records. A discovery conference occurred on January 31, 2006, and Mr. Jonsson thereafter proposed to treat an agreement to produce what ETI was obliged to produce in October 2005 as a new RFP.

51.     By March 7, 2006, ETI agreed to deliver finalized financial statements to Scheets for 2003 and 2004 with its QuickBooks for the same years. Scheets agreed to defer a request for the 2003 and 2004 bank records until he reviewed the financial statements and thereafter, he was to inform ETI if he still required those bank records.

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREACH OF FIDUCIARY DUTIES BY CPA FIRM --  - **15**

Finally, ETI stated its intent to make a pro rata distribution to shareholders, including Mr. Scheets to cover a portion of those taxes.

52.    On March 13, 2006, Mr. Ashe prepared an email summarizing "an agreement reached to narrow the scope of issues in dispute between the parties." The summary in no way described an agreement between the parties. Here is Scheets' counsel's response to this summary:

> . . .[O]ur initial focus is on trying to reach agreement on a set of numbers that can be used to mediate the case. If that is successful, then we don't need to go further . . . When we spoke last week and today, I stated that this process was not intended as an alternate to the statutory method of valuation to be employed at trial, which allows Scheets to present evidence of oppression. Nor is it intended to foreclose discovery.

> . . .We confirm receipt of the electronic version of Quickbooks now and accept the representation that these cover the years 2003 and 2004 and are complete.

> . . . Ric, we are looking forward to the memorandum and working papers [from AKT], However I told you of our conditions today: if AKT has relied on management alone to establish the integrity of financial records of the company as stated in the reports, that limitation remains an obstacle to our ability to accept the memorandum and working papers at face value. In doing the review, AKT's job is to see that the financial statements comport with GAAP. That limitation is a reflection of the engagement.

> See my caveat regarding reliance on management and GAAP in the preceding comment. Also, discovery may be needed to alleviate concerns. (emphasis supplied) (Ex. 11)

53.    ETI made no pro rata distribution to Scheets to pay the tax due on income allocated to him by Encompass for the year 2004.

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING BREACH OF FIDUCIARY DUTIES BY CPA FIRM --  - **16**

54.     Scheets established immediately that ETI's QuickBooks files for 2003 and 2004 were unreliable because the audit trail feature had been turned off in connection with transactions for those years.  When this feature is on and kept on, the audit transaction report shows any modifications or deletions for any transaction reported. When this feature is off, then the personnel at either Savant or ETI may modify or delete transactions without AKT knowing of these changes.  On March 14, 2006, Scheets emailed ETI:

> To put it bluntly, if the audit trail preference is 'off' for any period of time at either Encompass or Savant, Scheets will have serious concerns about the Integrity of this process. Further, it would be useful to know how, or if AKT indirectly addressed any limitations presented by the audit trail through the limiting language contained in each report –that AKT obtained its information from management.

Since then, the financial reports for 2003 and 2004 were established as unreliable because AKT's reports limited its engagement to determining that the financial statements were in conformity with GAAP – again, relying upon the representations of management.


## VII.   CONDUCT OF HOLMES

55.     On or about June 28, 2004, or approximately one week after ETI and Kersh had sued Scheets in the cases now before Judge Hubel, Patrick Boyle obtained a bank check for $725,000 drawn on an ETI corporate checking account.  Thereupon, Patrick Boyle and Michael Boyle opened a new account at WAMU in the name of ETI, and each was a signatory on that account and a second interest earning "sweep

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREACH OF FIDUCIARY DUTIES BY CPA FIRM  --  - **17**

account" at WAMU.  Holmes had access to all of ETI's corporate accounts during this time period, including the two WAMU accounts that were otherwise unknown to Scheets.  Holmes was providing "day to day" accounting services to ETI, Savant, the Boyles, and John Cargal which inherently posed a conflict of interest.  He or employees of HR as a routine practice would obtain, review and reconcile ETI's bank statements on a monthly basis while keeping track of interim deposits and withdrawals.  The transfer from an ETI corporate account in the form of a bank check for $725,000 from ETI's corporate account to the WAMU was known, or should have been known to Holmes and HR as it occurred within the period covered by the consolidated compilation reports, which concluded on July 31, 2004.

56.    The sum of $725,000 was thereafter transferred from ETI's WAMU account to WAMU accounts in the name of various entities owned and controlled by Michael Boyle, including but not limited to "Miridion" and "Paper Chase" and then to Michael Boyle's personal account(s).  Mr. Boyle used these funds to produce musical recordings, to purchase an automobile, a diamond Rolex watch at a discount from one of Holmes' clients, together with a pair of diamond pendant earrings for his former girl friend.  A check in the approximate amount of $81,000 was paid to HR as professional fees from Miridion or Paper Chase.  Until July 2005, the balance of ETI's funds were frittered away by Mr. Boyle as he shopped at high end boutiques for luxury goods, high end clothing and accessories, wine, meals, recording equipment, and travel.  However, no funds were available from ETI to distribute to Scheets to pay income taxes on income allocated to him by ETI.

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREACH OF FIDUCIARY DUTIES BY CPA FIRM  --  - **18**

57.    Between June 2004 and July 2005, HR received payments for professional services from ETI and Savant exceeding $800,000. These relate to the preparation of the Compilation Reports and the Related Party Transaction Reports. As alleged earlier, Holmes received personal loans from ETI during the period May 4, 2004. through April 2005, totaling $1,226,000. These fees were excessive and in no way represented the fair value of such services, which, in any event were tainted by his receipt of the undisclosed loans and his professional misconduct. The scope of HR's engagement for the Related Party Transaction Reports was determined by Holmes without consultation with the Boyles. Each report determined that a sum exceeding $300,000 "was due" from Michael Boyle, while a second report excoriated John Cargal for similar diversions. A second transaction involving the sum of $245,000 diverted from Savant to Savant to ETI to Adam Clark to Ron Tonkin Ferrari in Portland and was not addressed although Adam Clark and Mike Boyle were at all times available to explain the transaction, and Mr. Boyle was driving the Ferrari.

58.    In his claims against the Boyles, Cargal, Kersh, and Savant, Scheets had alleged diversions of corporate contracts and opportunities from ETI to Savant; and the diversion of ETI's funds to the Boyles as loans, excessive compensation, and payment of personal expenses. Scheets had alleged that the Boyles, Cargal, and Kersh had breached their fiduciary duties of loyalty, care, candor, good faith, and fair dealing. ETI had exercised a statutory right in an equitable proceeding to acquire Scheets' shares at fair value, and the lack of financial information credible to Scheets had been acknowledged by Teicher in his affidavit to the Court dated November 19, 2004.

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREACH OF FIDUCIARY DUTIES BY CPA FIRM  --  - **19**

59.    In consideration of personal loans from Michael Boyle to him totaling

$1,226,000, and the payment of professional fees to HR exceeding $800,000, Holmes

associated his and HR's names with the Related Party Transaction Reports in a manner

as to imply that he was independent when he was not.  Holmes further determined that

the scope of HR's engagement for the valuation of Scheets' shares would be limited to

Compilation Reports, thereby attempting to sidestep his obligation to disclose the

transfer of $725,000 by a bank check from a known ETI account to an unknown

corporate account at WAMU.  By his failure to disclose this transfer to Scheets, and by

failing to disclose the personal loans to Scheets, Holmes and HR aided and assisted the

Boyles and Cargal in the breach of their fiduciary duties to Scheets as a minority

shareholder of ETI.

## FIRST COUNT FOR FRAUDULENT MISREPRESENTATIONS AND FAILURE TO DISCLOSE

60.    Scheets restates and incorporates by reference allegations 1-59.

61.    Holmes knowingly and willfully made material false representations to

Scheets about existing facts and failed to disclose material facts in circumstances

requiring disclosure, for example, where he possessed information superior to Scheets

about the matters relating to the following:

A.    His failure to disclose to Scheets a transfer of $725,000 from one of

ETI's corporate accounts to the ETI account at WAMU of which Holmes had prior

knowledge;

B.    His failure to disclose to Scheets before he began work on the

Compilation Reports and the RRPT, and that as early as mid-2003 he had begun

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREACH OF FIDUCIARY DUTIES BY CPA FIRM  --  **- 20**

to actively assist the Boyles, Kersh, and Cargal in planning the diversion of contracts and business opportunities from ETI to Savant;

C.    His failure to disclose to Scheets before he and HR began work on the Compilation Reports and the RRPT that Michael Boyle, Patrick Boyle, and John Cargal were clients of his and HR and that he had a conflict of interest;

D.    His failure to disclose to Scheets before, during, and after his and HR's work on the Compilation Reports and the RRPT that he borrowed funds from Michael and Patrick Boyle totaling $1,220,000 and that he was not independent;

E.    After his discovery of wire transfers totaling $746,000 to him from an ETI account to his account on or about April 7, 2005, failing to disclose to Scheets the occurrence of these transfers until September 2007;

F.    His failure to disclose to Scheets an agreement with ETI, Savant, and the Boyles to withhold production of documents that HR and Holmes had previously agreed to produce which were subject to outstanding requests for production of documents and not disclosing the agreement to Scheets;

G.    Withholding Savant's original books and records without subsequent adjustments from Scheets, including the closing, combining or consolidating of journal entries by Patrick Boyle, Holmes, HR and others;

62.    Scheets had a right to rely on the representations of Holmes and HR as this purported to act for ETI during the relevant period.  Scheets did in fact rely on the

representations of Holmes and HR, to his detriment, in handling his involvement with ETI.

63.    Holmes' and HR's failure to disclose other material facts to Scheets on a timely basis, whether before, during, or after his engagements with ETI and Savant, caused injury to Scheets alone.

64.    Scheets has incurred extraordinary attorneys' fees and costs in connection with the lawsuit pending before Judge Hubel caused in part or in whole by Holmes' actions complained of above.  Additionally, Holmes and HR agreed with ETI and the Boyles to conceal from Scheets for a period of months the evidence of the diversion of funds totaling $746,000 from ETI to Holmes that Patrick Boyle used to fund Holmes' loan.

65.    Between counsels, it was agreed by HR and ETI that they would not produce HR's working papers to Scheets as previously agreed by each of them, despite the fact that these were subject to requests for production of documents.

66.    In the meantime, and as they had done for years, the Boyles availed themselves of the confusion generated by a succession of attorneys and CPA's to loot ETI and Savant to the continuing detriment of Scheets.

### SECOND COUNT FOR BREACH OF DUTY OF DISCLOSURE TO SCHEETS

67.    Scheets realleges paragraphs 1 through 65 above.

68.    Holmes and, through him, HR owed a duty of care to Scheets based upon the existence of a "special relationship" and Scheets' lack of knowledge relating to the following matters.  It was foreseeable that Scheets' interest in ETI would be injured if

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREACH OF FIDUCIARY DUTIES BY CPA FIRM  --  - 22

Holmes did not disclose to him the following facts that were material to his investment in ETI:

      A.      Failing to disclose to Scheets a transfer of $725,000 from one of ETI's corporate accounts to the ETI account at WAMU of which Holmes had prior knowledge;

      B.      Failing to disclose to Scheets before he began work on the Compilation Reports and the RRPT, and that as early as mid-2003 he had begun to actively assist the Boyles, Kersh, and Cargal in planning the diversion of contracts and business opportunities from ETI to Savant;

      C.      Failing to disclose to Scheets before he and HR began work on the Compilation Reports and the RRPT that Michael Boyle, Patrick Boyle, and John Cargal were clients of his and HR and that he had a conflict of interest;

      D.      Failing to disclose to Scheets before, during, and after his and HR's work on the Compilation Reports and the RRPT that he borrowed funds from Michael and Patrick Boyle totaling $1,220,000 and that he was not independent;

      E.      After his discovery of wire transfers totaling $746,000 to him from an ETI account to his account on or about April 7, 2005, failing to disclose to Scheets the occurrence of these transfers until September 2007;

      F.      Failing to disclose to Scheets an agreement with ETI, Savant, and the Boyles to withhold production of documents that HR and Holmes had previously agreed to produce and which were subject to outstanding requests for production of documents and not disclosing the agreement to Scheets;

G.     Withholding Savant's original books and records without subsequent adjustments from Scheets, including the closing, combining, or consolidating of journal entries by Patrick Boyle, Holmes, HR and others;

69.    Holmes' and HR's failure to disclose these and other material facts to Scheets on a timely basis, whether before, during, or after his engagements with ETI and Savant, caused injury to Scheets alone

## THIRD COUNT FOR AIDING AND ASSISTING AND/OR CONSPIRACY TO VIOLATE MINORITY SHAREHOLDER RIGHTS

70.    Scheets re-alleges prior allegations 1 – 68.

71.    John J. Cargal, Michael A. Boyle, and Patrick Boyle, as officers, directors, shareholders and control persons of ETI, acting individually or in concert with one another, owed fiduciary duties to Scheets, including but not limited to the duty to disclose material information to Scheets, a duty of loyalty, a duty of care, and a duty of good faith, and fair dealing.

72.    Holmes and, through him, HR aided and assisted John J. Cargal, Michael A. Boyle,  Patrick Boyle, and Karol W. Kersh in breach of their fiduciary duties as follows:

A.     Holmes and, through him, HR knowingly and intentionally aided and assisted the Boyles, Cargal, and Kersh to divert and conceal the diversion of corporate contracts, opportunities, manpower, equipment, and other property from ETI to Savant;

B.     Holmes and, through him, HR knowingly and intentionally  aided and assisted the Boyles, Cargal, and Kersh in the making and concealing of

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREAD OF FIDUCIARY DUTIES BY CPA FIRM  --  - **24**

improper loans to the Boyles, and the improper reimbursement of their personal expenses by ETI, as well as excessive salaries;

C.    Holmes and, through him, HR knowingly and intentionally aided and assisted the Boyles, Cargal, and Kersh in the withholding of cash distributions to Scheets to enable him to pay the personal income taxes that he incurred as a result of the allocation of income to him by ETI facilitating the payment of periodic loans from ETI to pay their personal income taxes on income allocated to them by ETI;

D.    Holmes and, through him, HR knowingly and intentionally aided and assisted the Boyles, Cargal, and Kersh in the concealment of the transfer of $725,000 from ETI's known corporate account to the WAMU accounts and then to accounts controlled directly or indirectly by Michael Boyle in the breach of their fiduciary duties to Scheets

E.    Holmes and, through him, HR knowingly and intentionally aided and assisted the Boyles, Cargal, and Kersh in the acts of shareholder oppression set forth throughout this complaint, for example, when Holmes was silent when Kersh represented to Scheets in a letter dated May 4, 2004 that ETI had suffered from chronic cash shortages and that Kersh further knew of no companies competing with ETI, in which the Boyles and Cargal owned a competing interest.

F.    Holmes and, through him, HR knowingly and intentionally aided and assisted the Boyles, Cargal, and Kersh in the acts of shareholder oppression set forth in this complaint by the preparations of the Compilation Reports and the

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING
BREACH OF FIDUCIARY DUTIES BY CPA FIRM  --  - **25**

RRTP that were known by Holmes to contain false and/or incomplete information, they intended Scheets to rely upon for the purpose of valuing his shares.

## VIII.   PRAYER FOR RELIEF

1.      Scheets re-alleges all prior allegations and affirmatively states that the specific acts of misconduct described with this Complaint, specifically including the scheme to violate fiduciary duties owed to Mr. Scheets and to squeeze him out as a shareholder of ETI, constitute willful and wanton misconduct, violating all norms of acceptable behavior, and is the type of misconduct warranting the imposition of punitive damages, which should be awarded in favor of Mr. Scheets in the amount of not less than $1 Million.

2.      That the Court enters judgment in Scheets' favor against Holmes and HR, jointly and severally, for damages based upon his claims for fraudulent misrepresentations in an amount to be proven at trial;

3.      That the Court enter judgment in Scheets' favor against Holmes and HR, jointly and severally, for damages based upon their breach of duty of disclosure owed to him by virtue of a "special relationship" between them and Scheets, in an amount to be proven at trial;

4.      That the Court enters judgment in Scheets' favor against Holmes and HR, jointly and severally, for damages based upon their aiding and assisting and/or conspiracy to violating his rights as a minority shareholder;

COMPLAINT FOR NEGLIGENT MISREPRESENTATION; AIDING & ASSISTING BREACH OF FIDUCIARY DUTIES BY CPA FIRM --  - 26

5.    Plaintiff seeks an award of his attorneys' fees and costs as may be allowed by law.

DATED this 3rd day of August, 2007.

McEwen Gisvold LLP

**F. Gordon Allen, OSB No. 770103**
Attorney for Plaintiff Randy Scheets